**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| **MILAN EXPRESS CO., INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | |
| **APPLIED UNDERWRITERS CAPTIVE** | ) | **JURY DEMAND** |
| **RISK ASSURANCE COMPANY, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff, Milan Express Co., Inc. ("Milan"), by and through counsel, and for its complaint against Defendant, Applied Underwriters Captive Risk Assurance Company, Inc. ("Applied Underwriters"), states as follows:

## I. PARTIES, JURISDICTION, AND VENUE

1.     Milan is a corporation organized and existing under the laws of Tennessee, and maintains its principal place of business in Milan, Gibson County, Tennessee.

2.     Applied Underwriters is, upon information and belief, a corporation organized and existing under the laws of the British Virgin Islands, and maintains its principal place of business in Omaha, Nebraska.

3.     Tracy Light is a Tennessee resident and an insurance agent who at the pertinent times was employed by Brown and Brown (formerly Security Services, Inc.).  At all relevant times, Light was acting in the course and scope of her employment at Brown and Brown and therefore her actions are imputed to Brown and Brown under the theory of *respondeat superior*.

4.     Brown and Brown is an insurance intermediary organization or insurance broker that provides a variety of insurance and reinsurance products and services to businesses.  Brown

and Brown is headquartered in Daytona Beach and Tampa, Florida and has offices located in Tennessee.

5.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), inasmuch as complete diversity of citizenship exists between the parties and the amount in controversy is in excess of $75,000.00.

6.     Pursuant to 28 U.S.C. § 2201(a), this court may declare the rights and other legal relations between Milan and Applied Underwriters that are in actual controversy.

7.     Venue is proper in the Western District of Tennessee pursuant to 28 U.S.C. §1391(b), as a substantial part of the events giving rise to the claims in this action occurred in this District.

## II.  FACTS

**A.     Milan Seeks Workers' Compensation Insurance Coverage.**

8.     Milan is a transportation services company that provides trucking, logistics, warehousing and distribution services in Tennessee and in other states.

9.     Milan is subject to the workers' compensation laws of Tennessee and other states. The workers' compensation laws of Tennessee, in particular, require Milan to maintain workers' compensation insurance, or, alternatively, to meet certain self-insurance requirements.

10.     In order to satisfy its obligations under those workers' compensation laws, Milan maintains a policy of workers' compensation insurance.

11.     Milan's existing worker's compensation insurance coverage was coming to an end of its term at the end of September 2008.

12.     On or about September 25, 2008, Tracy Light of Brown and Brown met with Milan and provided proposals for insurance.   One proposed option was with Occuserve

2

Insurance, but required a great deal of collateral in the form of a letter of credit which was not feasible.  The only viable solution offered by Light was the Applied Underwriters Workers Compensation Profit Sharing Plan.  A copy of the proposed Workers Compensation Plan is attached as Exhibit 1.

13.     Brown and Brown represented that it was an insurance firm built on the understanding of and consideration of the insurance buyer's needs.  Brown and Brown also represented that when purchasing insurance, a business is "buying security and peace of mind." Further, Brown and Brown represented that insurance should not be purchased without the advice of an insurance professional and that its agents had the knowledge and expertise to design an insurance program that would effectively and economically fit the needs of the business. Brown and Brown represented that its insurance professionals would assist in selecting the best insurance for a particular situation.  Milan reasonably relied on these representations.

14.     At all pertinent times, Light and Brown and Brown were acting as agents of Applied Underwriters.  Tenn. Code Ann. § 56-6-115(b) provides, "An insurance producer who solicits or negotiates an application for insurance shall be regarded, in any controversy arising from the application for insurance or any policy issued in connection with the application between the insured or insured's beneficiary and the insurer, as the agent of the insurer and not the insured or insured's beneficiary."  Hence, the actions, representations, and mistakes of Light and Brown and Brown are attributable to Applied Underwriters.

15.     Light represented to Milan that it would save money under the Applied Underwriters program and that it was a good deal.  Light also represented that the premiums would be tied to the number of Milan's employees.  Light did not tell Milan of the early cancellation penalties or the excessive fees, surcharges, expenses, or exorbitant premiums that

Applied Underwriters would charge.  Light also did not tell Milan that Applied Underwriters was not licensed in the State of Tennessee or the other states in which Milan was doing business to sell insurance, nor did she tell Milan that the insurance program had not been approved by the Tennessee Department of Insurance and Commerce or insurance departments in other states in which Milan was operating.

16.     Milan reasonably relied on all of these representations and expected that Light would explain fully and accurately the Applied Underwriters program.

**B.     Applied Underwriters Proposes a "Profit Sharing Plan."**

17.     Applied Underwriters proposed to Milan a scope of workers' compensation coverage that boasted a "profit sharing plan," which Applied Underwriters characterized as a reinsurance transaction.  See Exhibit 1.

18.     Applied Underwriters' proposal was presented to Milan in Gibson County, Tennessee.

19.     Applied Underwriters' proposal consisted of two components:  (1) guaranteed cost workers' compensation insurance policies, which Applied Underwriters would procure for Milan through Continental Indemnity Company and California Insurance Company both of which are affiliated related insurance companies, and (2) a "protected cell" Applied Underwriters would maintain for Milan's benefit.

20.     Applied Underwriters' proposal contemplated that workers' compensation insurance premiums Milan paid would be deposited into the protected cell and that losses (*i.e.*, workers' compensation benefits paid) would be paid from it.

21.     Applied Underwriters represented to Milan that its proposal offered the opportunity for cost savings.

4

**C.     The Applied Underwriters-Milan Reinsurance Participation Agreement.**

22.     In reliance on the representations made by Applied Underwriters and its agents, Milan entered into a Reinsurance Participation Agreement with an effective date of October 1, 2008 (the "Agreement').  A true and correct copy of the Agreement is attached hereto as Exhibit 2.

23.     Pursuant to the Agreement, Applied Underwriters billed Milan, in Gibson County, Tennessee, for premiums due it under the Agreement.  Milan also deposited $334,000 which it was led to believe was refundable.   To the contrary, Applied Underwriters counted only $282,000 toward the deposit and Applied Underwriters took the remaining funds as surcharges or expense fees, unbeknownst to Milan at the time.  This amount of surcharge or fee was not disclosed to Milan.

24.     Applied Underwriters' billing broker, Applied Risk Services, Inc., withdrew premiums from Milan's account and deposited funds into the protected cell.

25.     Upon information and belief, Applied Underwriters used monies Milan deposited into the protected cell to pay premiums due under the guaranteed cost workers' compensation insurance policies, which were issued by California Insurance Company and Continental Indemnity Company.  These insurance policies covered workers' compensation claims by Milan employees in the following states:  Tennessee, Alabama, Kentucky, North Carolina, Mississippi, Wisconsin, Illinois, South Carolina, Missouri, Indiana, Virginia, and Georgia (collectively referred to as the "Insured States").

*(1)     The Agreement is a "Retro" Insurance Policy.*

26.     Although the Agreement is characterized as a "reinsurance participation agreement," it is in effect a retrospective rating insurance policy.

5

27.     In a traditional reinsurance transaction, an insured contracts with an insurance carrier to insure against certain risks, and pays premiums to that insurer, which issues a policy to the insured.  The insurer then contracts with the reinsurer, who insures all or a portion of the insurer's risk under the policy in exchange for a premium the insurer pays to the reinsurer.  The contracts of insurance and reinsurance remain distinct and unconnected.

28.     A retrospective rating, or "retro," insurance policy bases the premium on the total payroll of covered employees during the policy period.  Retro policies are often used where the exact composition of the employer's workforce is subject to substantial variation, or where the insured's risk is difficult to measure at the beginning of the policy period.

29.     Under a retro policy, the employer deposits estimated premiums with the insurer. Later, the insurer conducts a retrospective premium audit, looking back at the workers who were actually on the insured's payroll during the policy period, utilizing records provided by the insured employer related to employee payroll and classification. The actual insurance premium due for the immediate past policy period is then determined based on the results of the audit.

30.     Despite being characterized as a reinsurance participation agreement, the Agreement is not part of a reinsurance transaction, because Milan pays insurance premiums directly to Applied Underwriters, the purported reinsurer, which in turn makes payment to California Insurance and Continental Casualty, the primary insurers.

31.     Rather, the Agreement is a disguised retro policy, because it provides that estimated premiums be paid to Applied Underwriters and deposited in the segregated cell, which is then used to pay the California Insurance and Continental Casualty policy premiums and other obligations.  The actual premiums due under the Agreement are based on the results of audits of Milan's employment records.  Upon information and belief, Applied Underwriters disguised the

6

true nature of this Agreement in an attempt to circumvent certain insurance laws in the Insured States.

**(2)     *Tennessee Insurance Laws Relating to the Agreement.***

32.     Pursuant to Tenn. Code Ann. § 56-2-105, it is unlawful for any company to enter into a contract of insurance as an insured, or to transact insurance business in the State of Tennessee, without a certificate of authority from the Tennessee Commissioner of Insurance (the "Commissioner"), with certain exceptions.

33.     Any captive insurance company may apply to the Commissioner for a license to do insurance business in Tennessee.  To operate in Tennessee as a captive insurance company, it must first obtain from the Commissioner a license.  Its board of directors or committees must hold at least one meeting in the State of Tennessee each year.  It must maintain a principal place of business in Tennessee and appoint a registered agent to accept service of process in Tennessee.  Tenn. Code Ann. § 56-13-103.

34.     Pursuant to Tenn. Code Ann. § 56-2-107, any of the following acts, effected by mail or otherwise by an unauthorized insurer, are deemed to constitute transacting insurance business in Tennessee:

(1)     The issuance or delivery of contracts of insurance to residents of this state;
(2)     The solicitation of applications for contracts of insurance;
(3)     The collection of premiums, membership fees, assessments or other considerations for contracts of insurance; or
(4)     The transaction of matters subsequent to the execution of contracts of insurance and arising out of them.

35.     Pursuant to Tenn. Code Ann. § 56-5-304(a)(1), insurance rates shall not be excessive.  A rate is excessive if it is likely to produce a profit that is unreasonably high for the insurance provided.  Tenn. Code Ann. § 56-5-304(b).

7

36.     The Commissioner may disapprove rates if the Commissioner finds that the rates are excessive, inadequate or unfairly discriminatory.  Tenn. Code Ann. § 56-6-308.  Every insurer providing a commercial risk insurance policy shall file with the Commissioner all rates, supplemental rates, information, policy forms and endorsements not less than 15 days after the effective date.  Tenn. Code Ann. § 56-5-306.

### *(3)     Other State Insurance Laws Relating to the Agreement*

**Wisconsin**

37.     Certificates of Authority are required for each insurer and such certificates expire annually.  [Wis. Stat. § 601.04]

38.     Workers compensation policy forms must be submitted to the Insurance Commissioner prior to the form's use.  [Wis. Stat. § 631.20]

**Illinois**

39.     It is unlawful to transact business within the State of Illinois without a Certificate of Authority from the Insurance Director.  [215 Ill. Comp. Stat. §5/121-2]

40.     Captive insurers must apply for Certificates of Authority.  [215 Ill. Comp. Stat. §5/123(c)-2]

41.     Workers compensation rates must be filed along with the manual of classifications, rules and rates, rating plans, and modifications thereto within 30 days of such rate's effective date.  [215 Ill. Comp. Stat. §5/457]

42.     Captive insurance companies are required to make annual reports.  [215 Ill. Comp. Stat. §5/123(c)-9]

43.     Illinois also has captive capital and surplus minimums. [215 Ill. Comp. Stat. §5/123(c)-3 and 123(c)-4]

8

**South Carolina**

44.     A licensing fee in South Carolina must be paid before an insurance carrier transacts business.  [S.C. Code Ann. §38-7-10]

45.     It is unlawful to transact business without a Certificate of Authority.  [S.C. Code Ann. §38-25-110]

46.     Premium taxes apply to workers compensation premiums.  [S.C. Code Ann. §38-7-50]

47.     Captive insurance companies may apply to the Insurance Director to write insurance within the State of South Carolina, except that workers compensation policies cannot be written directly by a captive.  [S.C. Code Ann. §38-90-20]

48.     Captive reinsurance companies doing business within South Carolina require a license.  [S.C. Code Ann. §38-90-25]

49.     South Carolina has capital and minimum reserve requirements. [S.C. Code Ann. §§38-90-40 and 38-90-45]

50.     Captive insurance companies and captive reinsurance companies are required to make annual filings to the South Carolina Insurance Commissioner.  [S.C. Code Ann. §38-90-70]

**Missouri**

51.     It is unlawful to transact insurance business without a Certificate of Authority from the Insurance Director.  [Mo. Rev. Stat. § 375.786]

52.     Transacting insurance business within the State of Missouri includes directly or indirectly acting as an agent for, or otherwise representing or aiding on behalf of another or any insurance company in the solicitation, negotiation, procurement or effectuation of insurance with

N SDC 920856 v3
2922905-000001  02/25/2013

respect to subjects of insurance resident, located or to-be-performed in the state. [Mo. Rev. Stat. § 375.786]

53.     The Insurance Commissioner may require that complete copies of all reinsurance treaties and contracts be filed and/or approved by him. [Missouri Regulations 20 CSR 200-20.030(6)]

54.     Competitive market rates for worker's compensation insurance, shall not be excessive, inadequate or unfairly discriminatory.  [Mo. Rev. Stat. § 287.950]

**Indiana**

55.     Insurance companies transacting business in Indiana are required to apply for a Certificate of Authority from the Insurance Commissioner.  [Ind. Code Ann. §27-1-3-20]

56.     All rates must be filed with the Department of Insurance along with other information requested by the Department, such as policy forms and endorsements.  [Ind. Code Ann. §27-1-22-4]

57.     Insureds must specifically agree to pay rates in excess of the filed rates.  [Ind. Code Ann. §27-1-22-4(j)]

58.     No deviations are allowed from the filed premium charges. No rebating, inducements or discounts not specified in the policy or filed with the Department is allowed. [Ind. Code Ann. §27-1-22-18]

**Alabama**

59.     A Certificate of Authority is required in order to transact insurance in the State of Alabama.  [Ala. Code §27-3-1]

60.     Unregistered companies are prohibited from aiding and assisting an authorized insurer in the transaction of business in Alabama.  [Ala. Code §27-10-1]

10

61.   Rating plans must be on file with the Insurance Commissioner.  [Ala. Code §27-13-67]

62.   Rates must be reasonable and not unfairly discriminatory.  The Commissioner considers several factors in determining whether a rate is reasonable, including the reasonable profit of the insurer.  [Ala. Code §27-13-35]

63.   No insurer shall charge or demand or receive a premium except in accordance with the rating system on file with the Insurance Commissioner.  [Ala. Code §27-13-76]

**Kentucky**

64.   Applications for certificates of authority shall be filed with the Commissioner on forms prescribed by the Commissioner. [KRS 304.3-150]

65.   A Certificate of Authority is required for a captive insurer under Kentucky law. [KRS 304.49.020]

66.   The act of ceding reinsurance to or assuming reinsurance from an unauthorized insurer as defined by Kentucky is a violation of the insurance codes.  [KRS 304.2-110]

67.   Insurance policy forms must be filed and approved by the Department of Insurance.  [KRS 304.14-120]

68.   Reinsurance forms may be filed with the Commissioner if he requests copies of same.  [KRS 304.5-150]

69.   Insurance rates must be filed with the Insurance Commissioner in Kentucky. [KRS 304.13-051]

**North Carolina**

70.   Every insurance company conducting business in North Carolina must be licensed and supervised by the Commissioner.  [N.C.G.S. §58-2-125]

11

71.     Insurance policies pertaining to loss or damages from sickness or bodily injury or death of the insured by accident must first be delivered to the State Insurance Commissioner for approval.  [N.C.G.S. §58-51-1]

72.     Every admitted insurer shall file with the Commissioner all rates and changes and amendments to its rates prior to the time that those rates become effective.  [N.C.G.S. §58-40-30]

73.     Transacting insurance business within the State of North Carolina is prohibited unless such insurer applies for a license with the Commissioner.  [N.C.G.S. §58-28-5]

74.     Transacting insurance business in North Carolina includes the making or proposing to make as an insurer, an insurance contract.  [N.C.G.S. §58-28-12]

75.     No insurer shall make any condition or stipulation in its contract concerning the court or jurisdiction in which suit or action on the contract may be brought.  [N.C.G.S. §58-3-35]

**Mississippi**

76.     Insurance rates shall not be excessive in Mississippi, or inadequate or unfairly discriminatory. The statute lists several criteria, including reasonable classification of risks and past and prospective loss and expense experience.  [Miss. Code Ann. §83-2-3]

77.     All rates of insurance must be submitted to the Commissioner, as well as all policy forms and endorsements at least 30 days prior to the proposed effective dates.  [Miss. Code Ann. §83-2-3]

78.     No insurance company may issue a contract or a policy without first filing such contract and policy with the Commissioner.  [Miss. Code Ann. §83-2-7]

79.     No foreign insurance company shall be admitted to or authorized to conduct insurance business in Mississippi until it first provides a certified copy of its charter, articles of incorporation, bylaws and deeds of settlement with the Insurance Commissioner, along with

12

$1,000 and a statement of its financial condition, and obtain a Certificate of Authority from the Commissioner.  [Miss. Code Ann. §83-21-1]

80.     Every insurance company, foreign and domestic, that qualifies to do business in Mississippi, is required to execute an agreement to be bound by the state statute of Mississippi pertaining to the periods of limitation prescribed by the statute of laws of the State of Mississippi.  [Miss. Code Ann. §83-5-3]

81.     Mississippi has not promulgated any captive insurance statutes that would authorize captive insurance companies to transact any business in Mississippi.

**Virginia**

82.     Foreign and alien insurance companies transacting business in Virginia must obtain a Certificate of Authority.  [Va. Code Ann. §38.2-1027]

83.     Unlicensed foreign and alien insurance companies are "transacting" business in Virginia if they issue or deliver insurance contracts to corporations authorized to do business in Virginia. [Va. Code Ann. §38.2-1039]

84.     All fees, charges, premiums or other considerations charged for the insurance or for the procurement of insurance must be stated in the policy. No insurer is permitted to charge or receive compensation for insurance in excess of the premium. [Va. Code Ann. §38.2-310]

85.     No insurance company may charge a rate in excess of the rate on file with the Commissioner unless the insurer files a written explanation of the reason for charging the excessive rate and the insured agrees in writing to pay the excessive rate. [Va. Code Ann. §38.2-1920]

13

86.     Insurers are required to file all rates and supplementary rates with the Commissioner of Insurance for approval on or before the date the rates become effective. [Va. Code Ann. §38.2-1906]

87.     Virginia's rate filing requirements were enacted to protect policy holders and the public from excessive, inadequate, or unfairly discriminatory insurance rates. [Va. Code Ann. §§38.2-2000; 38.2-1904]

88.     All captives transacting business in Virginia must pay taxes on premiums collected. [Va. Code Ann. §38.2-1108]

89.     Captive insurers are required to apply for a license from the Commissioner before transacting business in Virginia. [Va. Code Ann. §38.2-1102]

**Georgia**

90.     Certificates of Authority are required for all insurers transacting business in Georgia. [O.C.G.A. §33-3-2]

91.     Certificates of Authority expire annually and must be renewed. [O.C.G.A. §33-3-16]

92.     Insurers must also pay a licensing fee to conduct business in Georgia. [O.C.G.A. §33-8-3]

93.     To qualify to transact insurance business in Georgia, an insurer must maintain $1.5 million in capital stock or in surplus. [O.C.G.A. §33-3-6]

94.     No person is permitted to represent an insurer who is not duly authorized to transact insurance business in the State of Georgia.  (O.C.G.A. § 33-5-1)

95.     All foreign and domestic insurers doing business in Georgia are required to pay a tax of 2 1/4 percent of the gross premiums.  [O.C.G.A. § 33-8-4]

14

96.     Insurers are required to file rates, policies and bond forms with the Commissioner of Insurance.  Rates must be filed 45 days prior to its effective dates [O.C.G.A. §33-9-21]

97.     Captive insurance companies may engage in the business of insurance or reinsurance in Georgia, if the captive obtains a certificate of authority from the Commissioner and maintains a principal place of business in the State.  [O.C.G.A. §§33-41-3; 33-41-4]

98.     Captives must maintain minimum capital or surplus of up to $500,000. [O.C.G.A. §33-41-8]

**D.      Applied Underwriters' Violation of Insurance Law**

99.     Applied Underwriters, either directly or through its agents, has, *inter alia*, collected premiums and other assessments for contracts of insurance, and transacted matters subsequent to the execution of contracts of insurance and arising out of them.

100.    Applied Underwriters is not qualified or authorized to do business as an insurance company in the State of Tennessee by the Commissioner or in any of the other Insured States.

101.    Despite any descriptions to the contrary, the Agreement is not a contract of reinsurance as contemplated by Tenn. Code Ann. § 56-2-105(2) or the similar laws in the other Insured States.

102.    Applied Underwriters' solicitation of the Agreement, and collection of premiums and other assessments from Milan under the Agreement are in violation of Tenn. Code Ann. § 56-2-107 and the similar laws in the other Insured States.

**E.      Disputes Between Milan and Applied Underwriters Over Premium Billings.**

103.    Milan talked to Tracy Light about the possibility of selling its less than truckload division (LTL) and sought her advice on the effect of this sale on Milan's insurance premiums.

Light advised Milan that its premium would go down with the decrease in its payroll.  Milan reasonably relied on this representation.

104.    In February, 2011, Milan sold the LTL division.  As a result, Milan significantly reduced its workforce and therefore its workers' compensation exposure.

105.    Because premiums due under the Agreement were calculated from Milan's payroll, premiums due Applied Underwriters should have decreased with the decrease in Milan's workforce.

106.    Instead, Applied Underwriters' premium billings for February increased.  Milan contacted Applied Underwriters for an explanation.

107.    "Katie" of Applied Underwriters assured Milan that its premiums would decrease. To the contrary, the April 2011 premium billing was $481,150, more than twice the amount of the monthly premiums before the sale of the LTL division.

108.    Milan complained to Applied Underwriters that its premiums were excessive and unreasonable.  Applied Underwriters refused to adjust the premiums and threatened to cancel the California Insurance and Continental Indemnity policies if the premiums were not paid.

109.    In May 2011 Milan tried to work with Larry Billman, Applied Underwriters' settlement account manager, to understand why the premiums were so unreasonable.  Mr. Billman could not explain the calculation and only threatened to cancel the policy for nonpayment.

110.    Milan was not able to pay the outrageously high premium in May 2011.

111.    Applied Underwriters sent Milan a Notice of Cancellation for nonpayment on or about June 18, 2011, less than four months before the natural expiration of the Agreement.

112.    Applied Underwriters cancelled the California and Continental policies.

N SDC 920856 v3
2922905-000001  02/25/2013

113.   As a result of Applied Underwriters' premature and unwarranted cancellation, Milan was forced to obtain workers' compensation coverage from another insurer.

114.   Even after Applied Underwriters cancelled the policies and Milan was forced to obtain another policy, Milan continued to work in good faith with Applied Underwriters. Specifically, Milan agreed with Larry Billman to make a $100,000 payment in June 2011 and then make $50,000 payments in July, August, September, and October 2011.   Mr. Billman promised Milan that once those payments were made, then everything could be "settled up."

115.   Milan made these payments to Applied Underwriters totaling $300,000.

116.   In October 2011, Applied Underwriters told Milan that it owed an additional $900,000.   Milan disagreed and asked for an explanation of how that amount was calculated.

117.   On or about December 6, 2011, Applied Underwriters called Milan and stated that Milan owed $800,000.

118.   Over the next few months, Milan spoke with representatives of Applied Underwriters, including Jesse Bear and Larry Billman, in an attempt to resolve the dispute with Applied Underwriters.

119.   In February 2012, Milan made an offer for full and final settlement with Applied Underwriters in the amount of $376,128.   This figure was based on conversations between Milan and Jesse Bear and Larry Billman at Applied Underwriters.   Mr. Billman told Milan that this offer was reasonable and that he would give it to Applied Underwriters' in-house lawyer.

120.   On or about February 22, 2012, Applied Underwriters' in-house attorney, Jeffrey Silver, emailed a letter to Milan stating that the balance owed was $3,590,959.20.   A true and exact copy of this letter is attached as Exhibit 3.   This letter did not contain an explanation or calculation for this demand.   At this point, only 11 workers' compensation claims remained open.

17

121.    Over the course of the next year, Applied Underwriters made numerous demands on Milan to pay wildly different amounts.  On April 6, 2012, Applied Underwriters demanded payment from Milan in the amount of $4,919,200.16.  A true and exact copy of their demand is attached hereto as Exhibit 4.  On December 12, 2012, Applied Underwriters demanded payment of $3,366,904.20.  A true and exact copy of this demand is attached hereto as Exhibit 5.  As of February 13, 2013, Applied Underwriters demanded $3,844,625 from Milan.

122.    To date, Milan has paid Applied Underwriters $8,065,099 under the Agreement.  Total workers' compensation losses, as of January 31, 2013, are $5,215,491.  This equates to a loss ratio of 64.67%.

123.    Notwithstanding this loss ratio, Applied Underwriters contends that an additional sum of somewhere between $3,366,904.20 to $4,909,200.61 is outstanding and due it under the Agreement, and has made demand on Milan to make payment.  Milan has refused.

124.    As of February 13, 2013, there are only seven open worker's compensation claims and Applied Underwriters has sufficient funds reserved to cover these claims.  In fact, only five of these claims are still active and two of these should be settled soon.  Hence, there are only three open and active claims that may take some time to resolve.  These claims can be resolved for less than $500,000.

125.    Applied Underwriters is seeking collateral well in excess of the estimated ultimate claims cost.

126.    Applied Underwriters has never taken any per claim risk.  Milan's funds have covered all of the workers' compensation losses.

18

127.     It is virtually impossible for an insured like Milan to calculate the premiums and/or fees due by looking at the Agreement.   The Agreement is intentionally vague and confusing.

128.     Despite representations by Applied Underwriters and its agents to the contrary, no investment income applied to the cell.

129.     Applied Underwriters is seeking excessive fees, penalties, and service charges, but providing no additional benefit to Milan.

### III.  CAUSES OF ACTION AGAINST APPLIED UNDERWRITERS

### COUNT I:  DECLARATORY JUDGMENT

130.     Milan realleges and incorporates the allegations of paragraphs 1 - 129 of this Complaint, as if set forth fully herein.

131.     An actual controversy exists between Milan and Applied Underwriters as to the validity of the Agreement under Tennessee law and the law of the other Insured States, and whether and to what extent Milan has any further obligations to Applied Underwriters.

132.     Applied Underwriters has transacted insurance business in the State of Tennessee and the other Insured States without a certificate of authority from the Commissioner.

133.     Applied Underwriters transaction of insurance business in the State of Tennessee and the other Insured States without a certificate of authority from the Commissioner is in violation of Tenn. Code Ann. § 56-2-105 and similar laws set forth herein from the Insured States.

134.     Because Applied Underwriters has transacted insurance business in the State of Tennessee and the other Insured States without authority from the Commissioner, the Agreement is void.

N SDC 920856 v3
2922905-000001  02/25/2013

135.    Milan is entitled to a declaration from this court that:

(a)    The Agreement is a retrospective rating insurance policy issued by Applied Underwriters;

(b)    Applied Underwriters actions is soliciting the Agreement and billing, collecting, and demanding premiums thereunder and handling claims constitute transacting insurance business in Tennessee as defined in Tenn. Code Ann. § 56-2-107. Applied Underwriters' handling of workers' compensation claims in the other Insured States constitutes transacting insurance business in those states;

(c)    Applied Underwriters is not qualified or authorized to do business in the State of Tennessee by the Commissioner or in any of the other Insured States;

(d)    Applied Underwriters' solicitation of the Agreement, and collection of premiums and other assessments from Milan under the Agreement are in violation of Tenn. Code Ann. § 56-2-107; and

(e)    The Agreement is void.

**COUNT II:  DECLARATORY RELIEF**
**AND REFORMATION OF THE AGREEMENT**

136.    Milan realleges and incorporates the allegations of paragraphs 1 - 135 of this Complaint, as if set forth fully herein.

137.    As an alternative to the relief sought in Count I, Milan is entitled to a declaration from this court:

(a)    That the Agreement is an illegal retrospective rating insurance policy, and that the terms of the Agreement must be reformed to comply with Tennessee law;

(b)    As to what amounts Applied Underwriters was entitled to bill Milan under Tennessee law; and

20

(c)       As to what amounts, if any, Applied Underwriters must return to Milan.

## COUNT III:  DECLARATORY RELIEF

138.    Milan realleges and incorporates the allegations of paragraphs 1 - 137 of this Complaint, as if set forth fully herein.

139.    An actual controversy exists between Milan and Applied Underwriters as to the validity of the Agreement under Tennessee law, and whether and to what extent Milan has any further obligations to Applied Underwriters.

140.    The premiums Applied Underwriters has billed to and collected from Milan under the Agreement, and its demand for an additional payment in excess of $4,500,000, constitute excessive insurance rates in violation of Tenn. Code Ann. § 56-5-304 and similar laws in the other Insured States.

141.    Milan is entitled to a declaration from this court:

(a)       That the premiums Applied Underwriters billed Milan under the Agreement were and are excessive as defined in Tenn. Code Ann. § 56-5-303 and similar laws in the other Insured States;

(b)       As to what amount of premiums Applied Underwriters was entitled to bill Milan under the applicable laws in the Insured States; and

(c)       As to what amount of premiums, if any, Applied Underwriters must return to Milan.

## COUNT IV:  FRAUDULENT MISREPRESENTATION

142.    Milan realleges and incorporates the allegations of Paragraphs 1 - 141 of this Complaint as if set forth fully herein.

21

143.   Applied Underwriters, by and through its agents and representatives, intentionally and/or fraudulently misrepresented to Milan material facts about the expertise of their insurance agents, the ability of Applied Underwriters to conduct insurance business in Tennessee and the other Insured States, the true nature of the Agreement, the excessive fees, surcharges, penalties, and premiums contained in the Agreement, among other misrepresentations as more fully set forth herein.

144.   Milan reasonably relied on all of these misrepresentations which led it to do business with Applied Underwriters and ultimately to enter into the Agreement with Applied Underwriters.   But for these misrepresentations, Milan would not have entered into the Agreement with Applied Underwriters.

145.   As a result of Applied Underwriters' intentional and/or fraudulent misrepresentations, Milan has suffered damages which include, but are not necessarily limited to, payment of excessive fees, surcharges, penalties, and premiums to Applied Underwriters.   In addition, Milan has been forced to obtain alternative workers' compensation insurance and pay additional premiums.

## COUNT V:  NEGLIGENT MISREPRESENTATION

146.   Milan realleges and incorporates the allegations of Paragraphs 1 - 145 of this Complaint as if set forth fully herein.

147.   Applied Underwriters, by and through its agents and representatives, negligently misrepresented to Milan material facts about the expertise of their insurance agents, the ability of Applied Underwriters to conduct insurance business in Tennessee and the other Insured States, the true nature of the Agreement, the excessive fees, surcharges, penalties, and premiums contained in the Agreement, among other misrepresentations as more fully set forth herein.

N SDC 920856 v3
2922905-000001  02/25/2013

148.    Milan reasonably relied on all of these misrepresentations which led it to do business with Applied Underwriters and ultimately to enter into the Agreement with Applied Underwriters.   But for these misrepresentations, Milan would not have entered into the Agreement with Applied Underwriters.

149.    As a result of Applied Underwriters' negligent misrepresentations, Milan has suffered damages which include, but are not necessarily limited to, payment of excessive fees, surcharges, penalties, and premiums to Applied Underwriters.   In addition, Milan has been forced to obtain alternative workers' compensation insurance and pay additional premiums.

## COUNT VI:  BREACH OF CONTRACT

150.    Milan realleges and incorporates the allegations of Paragraphs 1 - 149 of this Complaint, as if set forth fully herein.

151.    To the extent that the Court determines that the Agreement should be upheld, then Milan asserts that Applied Underwriters breached this Agreement by increasing Milan's premiums after it sold its LTL division and reduced its work force by more than half.   In addition, Applied Underwriters breached the Agreement by prematurely canceling the insurance policies and requiring Milan to obtain alternative workers' compensation insurance.   Applied Underwriters also breached the Agreement by failing to negotiate in good faith both before the premature cancellation of the Agreement and afterwards.

152.    Milan has suffered damages as a result of Applied Underwriters' breach of contract which include, but are not necessarily limited to, the cost of having to purchase alternative workers' compensation insurance and the excessive fees, surcharges, penalties, and premiums charged by Applied Underwriters.

N SDC 920856 v3
2922905-000001  02/25/2013

## COUNT VII:  PUNITIVE DAMAGES

153.    Milan realleges and incorporates the allegations of Paragraphs 1 - 152 of this Complaint, as if set forth fully herein.

154.    Milan seeks punitive damages against Applied Underwriters in an amount to be determined at trial for the egregious misconduct of Applied Underwriters.  There is clear and convincing evidence that Applied Underwriters' actions were intentional, fraudulent, malicious, or reckless.

WHEREFORE, Plaintiff, Milan Express Co., Inc., prays:

1.    That proper process issue and be served upon Applied Underwriters, and that it be required to answer this Compliant within the time prescribed for it by law;

2.    That this Court declare that the Agreement is void;

3.    In the alternative, that this Court reform the Agreement to conform with Tennessee law;

4.    That this Court declare that the premiums Applied Underwriters billed to Milan were excessive;

5.    That this Court declare what amount of premiums Applied Underwriters was entitled to bill Milan under Tennessee law; and

6.    That this Court declare what amount of premiums, if any, Applied Underwriters must return to Milan.

7.    That this Court declare that Milan is entitled to a full, complete and accurate accounting from Applied Underwriters with regards to all moneys paid to, or received or processed by Applied Underwriters pursuant to the Agreement;

8.    A jury of twelve be empaneled to try this case;

9.     That Milan be awarded damages for Applied Underwriters' intentional and/or fraudulent misrepresentation, negligent misrepresentation, and breach of contract in an amount to be determined by a jury at trial;

10.     That a jury award Milan punitive damages for the intentional, fraudulent, or malicious conduct of Applied Underwriters in an amount to be determined at trial.

11.     That Plaintiff be awarded the costs of this action; and

12.     For such other, further relief as the Court may deem just and proper.


Respectfully submitted,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.


s/  *Scott D. Carey*
Scott D. Carey (BPR No. 15406)
(scarey@bakerdonelson.com)
Suite 800, Baker Donelson Center
211 Commerce Street
Nashville, Tennessee 37201
Tel.:  (615) 726-5600
Fax:  (615) 726-0464

*Attorneys for Plaintiff Milan Express Co., Inc.*