IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| MILAN EXPRESS CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-01069 |
| | ) | |
| APPLIED UNDERWRITERS CAPTIVE | ) | JURY DEMAND |
| RISK ASSURANCE COMPANY, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO STOP ARBITRATION

Plaintiff, Milan Express Co., Inc. ("Milan"), moves to stop the arbitration filed by Applied Underwriters Captive Risk Assurance Company, Inc. ("Applied Underwriters") in this matter because Nebraska law renders the purported arbitration clause in the Agreement relevant to this case unenforceable.

### I.   RELEVANT FACTS
#### A.   The Parties

Milan is a corporation organized and existing under the laws of Tennessee, and maintains its principal place of business in Milan, Gibson County, Tennessee. (D.E. 1, Compl. ¶ 1). Applied Underwriters is, upon information and belief, a corporation organized and existing under the laws of the British Virgin Islands, and maintains its principal place of business in Omaha, Nebraska. (*Id.* ¶ 2). Tracy Light is a Tennessee resident and an insurance agent who at the pertinent times was employed by Brown and Brown (formerly Security Services, Inc.). (*Id.* ¶ 3). At all relevant times, Light was acting in the course and scope of her employment at Brown and Brown and therefore her actions are imputed to Brown and Brown under the theory of *respondeat superior*. (*Id.*). Brown and Brown is an insurance intermediary organization or

1

insurance broker that provides a variety of insurance and reinsurance products and services to businesses. (*Id.* ¶ 4).

### B.  Milan Seeks Worker's Compensation Insurance Coverage

In order to satisfy its obligations under workers' compensation laws, Milan maintains a policy of workers' compensation insurance. (*Id.* ¶ 10). Milan's existing worker's compensation insurance coverage was coming to the end of its term at the end of September 2008. (*Id.* ¶ 11). On or about September 25, 2008, Tracy Light of Brown and Brown met with Milan and provided proposals for insurance. (*Id.* ¶ 12). One proposed option was with Occuserve Insurance, but required a great deal of collateral in the form of a letter of credit which was not feasible. (*Id.*). The only viable solution offered by Light was the Applied Underwriters Workers Compensation Profit Sharing Plan. (*See id.* at Ex. 1).

Brown and Brown represented that it was an insurance firm built on the understanding of and consideration of the insurance buyer's needs. (*Id.* ¶ 13). Brown and Brown also represented that when purchasing insurance, a business is "buying security and peace of mind." (*Id.*). Further, Brown and Brown represented that insurance should not be purchased without the advice of an insurance professional and that its agents had the knowledge and expertise to design an insurance program that would effectively and economically fit the needs of the business. Brown and Brown represented that its insurance professionals would assist in selecting the best insurance for a particular situation. Milan reasonably relied on these representations.

Light represented to Milan that it would save money under the Applied Underwriters program and that it was a good deal. (*Id.* ¶ 15). Light also represented that the premiums would be tied to the number of Milan's employees. Light did not tell Milan of the early cancellation penalties or the excessive fees, surcharges, expenses, or exorbitant premiums that Applied

Underwriters would charge. Light also did not tell Milan that Applied Underwriters was not licensed in the State of Tennessee or the other states in which Milan was doing business to sell insurance, nor did she tell Milan that the insurance program had not been approved by the Tennessee Department of Insurance and Commerce or insurance departments in other states in which Milan was operating. Milan reasonably relied on all of these representations. (*Id.* ¶ 16).

Applied Underwriters proposed to Milan a scope of workers' compensation coverage that boasted a "profit sharing plan," which Applied Underwriters characterized as a reinsurance transaction. (*Id.* ¶ 17). Applied Underwriters' proposal consisted of two components: (1) guaranteed cost workers' compensation insurance policies, which Applied Underwriters would procure for Milan through Continental Indemnity Company and California Insurance Company both of which are affiliated related insurance companies, and (2) a "protected cell" Applied Underwriters would maintain for Milan's benefit. (*Id.* ¶ 19). Applied Underwriters' proposal contemplated that workers' compensation insurance premiums Milan paid would be deposited into the protected cell and that losses (*i.e.*, workers' compensation benefits paid) would be paid from it. (*Id.* ¶ 20). Applied Underwriters represented to Milan that its proposal offered the opportunity for cost savings. (*Id.* ¶ 21).

C.   The Applied Underwriters-Milan "Reinsurance Participation Agreement"

In reliance on the representations made by Applied Underwriters and its agents, Milan entered into a "Reinsurance Participation Agreement" with an effective date of October 1, 2008 (the "Agreement"). (*Id.* ¶ 22; D.E. 1-4). Pursuant to the Agreement, Applied Underwriters billed Milan, in Gibson County, Tennessee, for premiums due it under the Agreement. Milan also deposited $334,000 which it was led to believe was refundable. To the contrary, Applied Underwriters counted only $282,000 toward the deposit and Applied Underwriters took the

3

remaining funds as surcharges or expense fees, unbeknownst to Milan at the time.  This amount of surcharge or fee was not disclosed to Milan.

Applied Underwriters' billing broker, Applied Risk Services, Inc., withdrew premiums from Milan's account and deposited funds into the protected cell.  (*Id.* ¶ 24).  Upon information and belief, Applied Underwriters used monies Milan deposited into the protected cell to pay premiums due under the guaranteed cost workers' compensation insurance policies, which were issued by California Insurance Company and Continental Indemnity Company.  These insurance policies covered workers' compensation claims by Milan employees in the following states: Tennessee, Alabama, Kentucky, North Carolina, Mississippi, Wisconsin, Illinois, South Carolina, Missouri, Indiana, Virginia, and Georgia (collectively referred to as the "Insured States").  (*Id.* ¶ 25).

Although the Agreement is characterized as a "reinsurance participation agreement," it is in effect a retrospective rating insurance policy.  (*Id.* ¶ 26).  In a traditional reinsurance transaction, an insured contracts with an insurance carrier to insure against certain risks, and pays premiums to that insurer, which issues a policy to the insured.  (*Id.* ¶ 27).  The insurer then contracts with the reinsurer, who insures all or a portion of the insurer's risk under the policy in exchange for a premium the insurer pays to the reinsurer.  The contracts of insurance and reinsurance remain distinct and unconnected.

A retrospective rating, or "retro," insurance policy bases the premium on the total payroll of covered employees during the policy period.  (*Id.* ¶ 28).  Retro policies are often used where the exact composition of the employer's workforce is subject to substantial variation, or where the insured's risk is difficult to measure at the beginning of the policy period.  Under a retro policy, the employer deposits estimated premiums with the insurer.  (*Id.* ¶ 29).  Later, the insurer

4

conducts a retrospective premium audit, looking back at the workers who were actually on the insured's payroll during the policy period, utilizing records provided by the insured employer related to employee payroll and classification. The actual insurance premium due for the immediate past policy period is then determined based on the results of the audit. Upon information and belief, Applied Underwriters disguised the true nature of this Agreement in an attempt to circumvent certain insurance laws in the Insured States. (*Id.* ¶ 31).

      D.      **Applied Underwriters' Violation of Insurance Law**

Applied Underwriters, either directly or through its agents, has, *inter alia*, collected premiums and other assessments for contracts of insurance, and transacted matters subsequent to the execution of contracts of insurance and arising out of them. (*Id.* ¶ 99). Applied Underwriters is not qualified or authorized to do business as an insurance company in the State of Tennessee by the Commissioner or in any of the other Insured States. (*Id.* ¶ 100). Despite any descriptions to the contrary, the Agreement is not a contract of reinsurance as contemplated by Tenn. Code Ann. § 56-2-105(2) or the similar laws in the other Insured States. (*Id.* ¶ 101). Applied Underwriters' solicitation of the Agreement, and collection of premiums and other assessments from Milan under the Agreement are in violation of Tenn. Code Ann. § 56-2-107 and the similar laws in the other Insured States. (*Id.* ¶ 102).

      E.      **Disputes Between Milan and Applied Underwriters Over Premium Billings**

Milan talked to Tracy Light about the possibility of selling its less than truckload division (LTL) and sought her advice on the effect of this sale on Milan's insurance premiums. (*Id.* ¶ 103). Light advised Milan that its premium would go down with the decrease in its payroll. Milan reasonably relied on this representation.

In February, 2011, Milan sold the LTL division. (*Id.* ¶ 104). As a result, Milan significantly reduced its workforce and therefore its workers' compensation exposure. Because premiums due under the Agreement were calculated from Milan's payroll, premiums due Applied Underwriters should have decreased with the decrease in Milan's workforce. (*Id.* ¶ 105). Instead, Applied Underwriters' premium billings for February increased. (*Id.* ¶ 106).

Milan contacted Applied Underwriters for an explanation. "Katie" of Applied Underwriters assured Milan that its premiums would decrease. (*Id.* ¶ 107). To the contrary, the April 2011 premium billing was $481,150, more than twice the amount of the monthly premiums before the sale of the LTL division. Milan complained to Applied Underwriters that its premiums were excessive and unreasonable. (*Id.* ¶ 108). Applied Underwriters refused to adjust the premiums and threatened to cancel the California Insurance and Continental Indemnity policies if the premiums were not paid.

In May 2011 Milan tried to work with Larry Billman, Applied Underwriters' settlement account manager, to understand why the premiums were so unreasonable. (*Id.* ¶ 109). Mr. Billman could not explain the calculation and only threatened to cancel the policy for nonpayment.

Milan was not able to pay the outrageously high premium in May 2011. (*Id.* ¶ 110). Applied Underwriters sent Milan a Notice of Cancellation for nonpayment on or about June 18, 2011, less than four months before the natural expiration of the Agreement. (*Id.* ¶ 111). Applied Underwriters cancelled the California and Continental policies. (*Id.* ¶ 112). As a result of Applied Underwriters' premature and unwarranted cancellation, Milan was forced to obtain workers' compensation coverage from another insurer. (*Id.* ¶ 113).

N EBM 951842 v1
2922905-000001  03/14/2013

Even after Applied Underwriters cancelled the policies and Milan was forced to obtain another policy, Milan continued to work in good faith with Applied Underwriters. (*Id.* ¶ 114). Specifically, Milan agreed with Larry Billman to make a $100,000 payment in June 2011 and then make $50,000 payments in July, August, September, and October 2011. Mr. Billman promised Milan that once those payments were made, then everything could be "settled up." Milan made these payments to Applied Underwriters totaling $300,000. (*Id.* ¶ 115).

In October 2011, Applied Underwriters told Milan that it owed an additional $900,000. (*Id.* ¶ 116). Milan disagreed and asked for an explanation of how that amount was calculated. On or about December 6, 2011, Applied Underwriters called Milan and stated that Milan owed $800,000. (*Id.* ¶ 117). Over the next few months, Milan spoke with representatives of Applied Underwriters, including Jesse Bear and Larry Billman, in an attempt to resolve the dispute with Applied Underwriters. (*Id.* ¶ 118).

In February 2012, Milan made an offer for full and final settlement with Applied Underwriters in the amount of $376,128. (*Id.* ¶ 119). This figure was based on conversations between Milan and Jesse Bear and Larry Billman at Applied Underwriters. Mr. Billman told Milan that this offer was reasonable and that he would give it to Applied Underwriters' in-house lawyer.

On or about February 22, 2012, Applied Underwriters' in-house attorney, Jeffrey Silver, emailed a letter to Milan stating that the balance owed was $3,590,959.20. (*Id.* ¶ 120 and Ex. 3). This letter did not contain an explanation or calculation for this demand. At this point, only 11 workers' compensation claims remained open. Over the course of the next year, Applied Underwriters made numerous demands on Milan to pay wildly different amounts. (*Id.* ¶ 121). On April 6, 2012, Applied Underwriters demanded payment from Milan in the amount of

$4,919,200.16. (*Id.* ¶ 121 and Ex. 4). On December 12, 2012, Applied Underwriters demanded payment of $3,366,904.20. (*Id.* ¶ 121 and Ex. 5). As of February 13, 2013, Applied Underwriters demanded $3,844,625 from Milan. (*Id.* ¶ 121).

To date, Milan has paid Applied Underwriters $8,065,099 under the Agreement. (*Id.* ¶ 122). Total workers' compensation losses, as of January 31, 2013, are $5,215,491. This equates to a loss ratio of 64.67%. Notwithstanding this loss ratio, Applied Underwriters contends that an additional sum of somewhere between $3,366,904.20 to $4,909,200.61 is outstanding and due it under the Agreement, and has made demand on Milan to make payment. (*Id.* ¶ 123). Milan has refused.

As of February 13, 2013, there are only seven open worker's compensation claims and Applied Underwriters has sufficient funds reserved to cover these claims. (*Id.* ¶ 124). In fact, only five of these claims are still active and two of these should be settled soon. Hence, there are only three open and active claims that may take some time to resolve. These claims can be resolved for less than $500,000. Applied Underwriters is seeking collateral well in excess of the estimated ultimate claims cost. (*Id.* ¶ 125). Applied Underwriters has never taken any per claim risk. (*Id.* ¶ 126). Milan's funds have covered all of the workers' compensation losses.

It is virtually impossible for an insured like Milan to calculate the premiums and/or fees due by looking at the Agreement. (*Id.* ¶ 127). The Agreement is intentionally vague and confusing. Additionally, despite representations by Applied Underwriters and its agents to the contrary, no investment income applied to the cell. (*Id.* ¶ 128).

Based on these facts, Milan filed a Complaint in this Court on February 25, 2013, seeking declaratory relief and reformation of the Agreement, bringing claims of fraudulent misrepresentation, negligent misrepresentation, breach of contract, and seeking punitive damages

8

for Applied Underwriters' intentional, fraudulent, malicious, or reckless actions.  (*See* D.E. 1, Compl.).

### F. The Arbitration Clause

The Agreement between Applied Underwriters and Milan contains the following provision, in pertinent part:

> It is the express intention of the parties to resolve any disputes arising under this Agreement without resort to litigation in order to protect the confidentiality of their relationship and their respective businesses and affairs.  Any dispute or controversy that is not resolved informally . . . arising out of or related to this Agreement shall be fully determined in the British Virgin Islands under the provisions of the American Arbitration Association.
>
> All disputes between the parties . . . shall be settled amicably by good faith discussion among all of the parties hereto, and failing such amicable settlement, finally determined exclusively by binding arbitration in accordance with the procedures provided herein.

(Compl. at Ex. 2 ¶ 13(A)).  The Agreement further provides that it "shall be exclusively governed by and construed in accordance with the laws of Nebraska."  (*Id.* ¶ 16).  Milan previously demanded arbitration, presumably relying on this provision in the Agreement.  However, Nebraska law invalidates the purported arbitration clause in the Agreement.

## II. ARGUMENT

The arbitration clause in the Agreement between Milan and Applied Underwriters is unenforceable under Nebraska law.  The issue of "whether the parties have a valid arbitration agreement at all" is a "gateway matter" that requires judicial resolution.  *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003).  Arbitrability presents a question of law that the Court should determine.  *Kremer v. Rural Cmty. Ins. Co.*, 788 N.W.2d at 544 (Neb. 2010).  This Court should grant Milan's motion to stay arbitration because no valid arbitration agreement exists between the parties.

9

Nebraska Revised Statute § 25-2602.01(f)(4) expressly provides that a provision to arbitrate future controversies in "any agreement concerning or relating to an insurance policy other than a contract between insurance companies including a reinsurance contract" is unenforceable. Nebraska law, therefore, precludes arbitration agreements for future controversies relating to insurance policies between insurance companies and their insureds. *See Kremer*, 788 N.W.2d at 544.

The Nebraska Supreme Court held in *Kremer* that § 25-2602.01(f)(4) is not preempted by the Federal Arbitration Act ("FAA"). *See id.* at 553. Under the FAA, arbitration provisions are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* (quoting 9 U.S.C. § 2). Under the federal McCarran-Ferguson Act, however, state law regulating the business of insurance reverse preempts federal law that does not specifically govern insurance. *Id.* (citing 15 U.S.C. §§ 1011 through 1015). According to the *Kremer* court, "[e]very federal appellate court to address this issue has held that state laws restricting arbitration provisions in insurance contracts regulate the business of insurance and are not preempted by the FAA." *Id.* at 552. The Nebraska court agreed with these courts and concluded that the FAA does not preempt Nebraska's § 25-2602(f)(4). *Id.* at 553.

The Nebraska court's decision is consistent with multiple federal appellate court decisions interpreting other states' statutes. *See Am. Bankers Ins. Co. of Florida v. Inman*, 436 F.3d 490, 494 (5th Cir. 2006) (holding that a similar Mississippi statute reverse preempted the FAA); *McKnight v. Chicago Title Ins. Co., Inc.*, 358 F.3d 854, 859 (11th Cir. 2004) (holding that a similar Georgia statute reverse preempted the FAA); *Standard Sec. Life Ins. Co. of New York v. West*, 267 F.3d 821, 823-24 (8th Cir. 2001) (holding that a similar Missouri statute reverse preempted the FAA); *Stephens v. Am. Int'l Ins. Co.*, 66 F.3d 41, 45-46 (2d Cir. 1995) (holding

10

that a similar Kentucky statute reverse preempted the FAA); *Mutual Reinsurance Bureau v. Great Plains Mut. Ins. Co., Inc.*, 969 F.2d 931, 935 (10th Cir. 1992) (holding that a similar Kansas statute reverse preempted the FAA).

Pursuant to Nebraska Revised Statute § 25-2602.01(f)(4), the arbitration clause in the Agreement between Milan and Applied Underwrites is unenforceable. *See Kremer*, 788 N.W.2d at 544. The Agreement provides that Nebraska law applies. (Compl. at Ex. 2 ¶ 16). Under Nebraska law, the parties could not agree to arbitrate future disputes in an "agreement concerning or relating to an insurance policy." *See id.* The purported arbitration clause in the Agreement, therefore, is unenforceable.

Applied Underwriters may argue that the Agreement is a reinsurance contract based on the title that Applied Underwriters gave the Agreement. Despite Applied Underwriters' attempt to characterize the Agreement as a reinsurance participation agreement, the Agreement is not part of a reinsurance transaction, because Milan pays insurance premiums directly to Applied Underwriters, the purported reinsurer, which in turn makes payment to California Insurance and Continental Casualty, the primary insurers. (Compl. ¶ 30). The Agreement is a disguised retro policy because it provides that estimated premiums be paid to Applied Underwriters and deposited in the segregated cell, which is then used to pay the California Insurance and Continental Casualty policy premiums and other obligations. (*Id.* ¶ 31). Applied Underwriters cannot avoid the effect of Nebraska Revised Statute § 25-2602.01(f)(4) by attempting to characterize the Agreement as something it is not.

Nebraska law forbids agreements to arbitrate future disputes concerning or relating to insurance contracts. As a result, the arbitration clause contained in the Agreement is void and unenforceable.

11

### III.     CONCLUSION

For the foregoing reasons, Milan respectfully asks this Court for an order holding that the arbitration clause is void and unenforceable.  In addition, Milan seeks an order stating that Milan is not required to arbitrate pursuant to the agreement and that instead its dispute with Applied Underwriters shall be adjudicated in this Court.

Respectfully submitted,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.


*s/  Scott D. Carey*
Scott D. Carey (BPR No. 15406)
(scarey@bakerdonelson.com)
Suite 800, Baker Donelson Center
211 Commerce Street
Nashville, Tennessee 37201
Tel.:  (615) 726-5600
Fax:  (615) 726-0464

*Attorneys for Plaintiff Milan Express Co., Inc.*


### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been provided by U.S. Mail, postage prepaid to the following:

Jeffrey A. Silver
Secretary and General Counsel
Applied Underwriters
Post Office Box 3646
Omaha, Nebraska  68103-0646

this 14th day of March, 2013.

*s/  Scott D. Carey*
Scott D. Carey

N EBM 951842 v1
2922905-000001  03/14/2013