IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

MILAN EXPRESS CO., INC.,

      Plaintiff,

v.                                    No. 13-1069

APPLIED UNDERWRITERS CAPTIVE
RISK ASSURANCE COMPANY, INC.,

      Defendant.
_____

ORDER ON OBJECTIONS TO THE ORDER OF THE MAGISTRATE JUDGE
_____

On October 3, 2013, pursuant to an order of reference, Magistrate Judge Edward G. Bryant granted the Plaintiff, Milan Express Co., Inc.'s ("Milan"), motion to stop arbitration (D.E. 5) and denied Defendant, Applied Underwriters Captive Risk Assurance Company, Inc.'s ("AUCRA"), motions to compel arbitration (D.E. 16) and to transfer venue (D.E. 17).  (*See* Order, D.E. 42.)  The magistrate judge found that although the contract governing this action contains an arbitration provision, the agreement to arbitrate is invalid under controlling state law.  Based on this finding, it was ordered that Plaintiff's action be adjudicated in federal court instead of in the nonjudicial forum of arbitration.  Additionally, the magistrate judge concluded that in the interest of justice and for the convenience of the parties and witnesses, venue should remain in this District and not be transferred to federal court in Nebraska.  AUCRA filed several objections to the magistrate judge's order, and the Plaintiff has responded.

*STANDARD OF REVIEW*

Although the parties have not raised the issue, the Court must initially determine whether the matters ruled upon by the magistrate judge are nondispositive such that its review of the

magistrate judge's order is governed by 28 U.S.C. § 636(b)(1)(A) and Rule 72(a) of the Federal Rules of Civil Procedure, or dispositive such that review is under 28 U.S.C. § 636(b)(1) (B) and Rule 72(b).

Pursuant to 28 U.S.C. § 636(b)(1)(A), a magistrate judge is not authorized to "determin[e]" matters that are "dispositive of a claim or defense of a party." Vogel v. U.S. Office Prods. Co., 258 F.3d 509, 514 (6th Cir. 2001).  "The list of dispositive motions contained in 28 U.S.C. § 636(b)(1)(A) is nonexhaustive, and unlisted motions that are functionally equivalent to those listed in 28 U.S.C. § 636(b)(1)(A) are also dispositive." Id. at 515 (citation omitted).  Thus, to decide whether a motion is dispositive, the court must conduct a functional analysis to see whether the motion has the same practical effect as a recognized dispositive motion.  Id. at 514–15.

Federal courts are split on whether a motion to compel arbitration should be treated as dispositive, see BBCM, Inc. v. Healthy Sys. Int'l, LLC, No. C10-0086, 2010 WL 4607919, at *1 n.1 (N.D. Iowa Nov. 4, 2010)(collecting cases), and the Sixth Circuit Court of Appeals has not definitively addressed the question.  Several district courts in this Circuit have deemed these motions dispositive matters and treated them accordingly.  See, e.g., Whaley v. T-Mobile, USA, Inc., No. CIV.A. 13-31-DLB-JGW, 2013 WL 5155342, at *1 n.1 (E.D. Ky. Sept. 12, 2013); Costello v. Patterson Dental Supply, Inc., No. 5:06-CV-213, 2007 WL 4178942, at *3 (W.D. Mich. Nov. 20, 2007); Flannery v. Tri-State Div., 402 F. Supp. 2d 819, 821 (E.D. Mich. 2005)("[A]n order compelling arbitration has the practical effect of allowing the case to proceed in a different forum. Therefore, the Court views the order compelling arbitration as a dispositive order that should be reviewed de novo."); cf. Patteson v. McAdams Tax Advisory Grp., LLC, No. 09-2085 Ma/P, 2010 WL 711161, at *1 n.1 (W.D. Tenn. Feb. 14, 2010)( noting that "some courts have held that motions

to compel arbitration are dispositive motions, while other courts have treated them as nondispositive motions," and deciding therefore to, "out of an abundance of caution," treat the matter as dispositive).  The Court agrees with those decisions from this and other circuits that have concluded a motion to compel arbitration presents a dispositive matter.  The Court reaches this conclusion not by viewing such a motion as functionally equivalent to one of the dispositive motions designated in  28 U.S.C. § 636(b)(1)(A).  Rather, a motion to compel arbitration *is* one of the dispositive motions listed in the statute: "a motion for injunctive relief."  *See* Horizon Plastics v. Constance, No. Civ. A 99-6132, 2000 WL 1176543, at *4 (D.N.J. Aug. 11, 2000)(characterizing motion to compel arbitration as one for injunctive relief because it essentially asks the court to issue an injunction ordering the parties to arbitrate their dispute).

Under similar reasoning, the Court finds that Plaintiff's Motion to Stop Arbitration also presents a dispositive matter.  Just as a motion to compel arbitration seeks injunctive relief in that it asks the court to *command*  proceedings in a different forum, a motion seeking to stop arbitration does so by asking the court to *interfere with* proceedings in a different forum.  Indeed, the Sixth Circuit has previously, albeit in a different context, characterized as injunctive the type of relief Plaintiff seeks in its motion, stating that a request for the court to invoke its equity powers to halt proceedings in another forum involves "the classic form of injunction."  Buffler v. Elec. Computer Programming Inst., Inc., 466 F.2d 694, 699 (6th Cir. 1972)(citing A. & E. Plastik Pak Co. v. Monsanto Co., 396 F.2d 710, 713 (9th Cir. 1968))(holding that district court's order staying arbitration proceedings was appealable as an interlocutory order granting an injunction); *accord* Mar-Len of La., Inc. v. Parsons-Gilbane, 773 F.2d 633, 635 n.1 (5th Cir. 1985)(concluding that an order addressed to proceedings in a separate tribunal clearly is an injunction).  Because a motion

3

seeking to stay arbitration is "a motion for injunctive relief" under 28 U.S.C. § 636(b)(1)(A), it is a dispositive matter not amenable to disposition by the magistrate judge.

As to whether Defendant's motion to transfer venue presents a dispositive matter, there is no controlling Sixth Circuit precedent, and the district courts in this Circuit are without consensus. *Compare* Dial Corp. v. News Corp., No. 12-15613, 2013 WL 5353078, at *2 (E.D. Mich. Sept. 24, 2013)(treating motion to transfer venue as presenting a "nondispositive issue"); Candela Mgmt. Grp., Inc. v. Taco Maker, Inc., No. CIV.A. 2:08-CV-1138, 2010 WL 1253552, at *3–4 (S.D. Ohio Mar. 31, 2010)(referring to motion to transfer venue as a "nondispositive matter" and reviewing objections to the magistrate judge's denial of the motion to transfer venue under clearly erroneous/contrary to law standard); Universal Settlements Int'l, Inc. v. Nat'l Viatical, Inc., No. 1:07-CV-1243, 2008 WL 5156642, at *1 (W.D. Mich. Dec. 8, 2008)(same); *and* City of Columbus v. Hotels.com, L.P., No. 2:06 CV 677, 2007 WL 2029036, at *3 (S.D. Ohio July 10, 2007)("Because a motion to transfer venue is not a dispositive motion, Magistrate Judge Abel's recommended disposition of the motion is not subject to *de novo* review.") *with* Payton v. Saginaw Cnty. Jail, 743 F. Supp. 2d 691, 693 (E.D. Mich. 2010)(vacating the magistrate judge's order granting motion to transfer venue because the magistrate judge "did not have the authority to enter" an order on a dispositive matter); Collins v. Synthes USA Sales, LLC, No. 1:09 CV 2868, 2010 WL 1408966, at *1, *3 (N.D. Ohio Apr. 2, 2010)(treating motion to transfer venue, which it had referred to the magistrate judge for report and recommendation, as a dispositive matter); *and* Temple v. Circuit City Stores, Inc., No. 2:05-CV-165, 2006 WL 2796483, at *1 (E.D. Tenn. Sept. 27, 2006)(considering *de novo* the objected-to portions of the magistrate judge's report and recommendation on motion to transfer venue and citing 28 U.S.C. § 636(b)(1)).  The above-cited cases contain little, if any,

analysis of this issue.  The single exception is <u>Payton v. Saginaw County Jail</u>, 743 F. Supp. 2d 691 (E.D. Mich. 2010).  There, the district court reviewed decisions from federal courts outside this Circuit and concluded that "the question is far from settled."  <u>Id.</u> at 692.  <u>Payton</u> found that several courts had treated a motion to transfer venue as a nondispositive matter under the reasoning that this type of motion merely addressed the forum where an action is adjudicated, not the merits of the case, and was therefore  not "dispositive."  <u>Id.</u>  However, the <u>Payton</u> court rejected that rationale, opining that  "the most accurate measure of whether an order on a motion is 'dispositive' is not whether the merits of the dispute are adjudicated, but whether activity in the case in that forum is terminated." <u>Id.</u> at 693.  It acknowledged that a transfer motion is not listed as a designated dispositive motion under 28 U.S.C. § 636(b)(1)(A), but reasoned that an order granting a transfer motion is functionally equivalent to an order of dismissal–albeit without prejudice–in that forum because it carries the consequence of depriving the plaintiff of his chosen location and forcing him to litigate elsewhere. The Court finds the reasoning of <u>Payton</u> persuasive and agrees that a motion to transfer venue is a dispositive matter excepted from the authority that 28 U.S.C. § 636(b)(1)(A) grants to magistrate judges.

Accordingly, the Court construes the magistrate judge's order as a report and recommendation and reviews the Defendant's objections to the magistrate judge's rulings *de novo*. *See* <u>United States v. First Nat'l Bank of Atlanta</u>, 628 F.2d 871, 873 (5th Cir. 1980)(finding it within the district court's discretion "to construe the magistrate's order as a proposed disposition"). Pursuant to Rule 72(b)(3) and 28 U.S.C. § 636(b)(1), the district judge is to make a *de novo* determination of the magistrate judge's recommendations to which objections have been made. "The district judge may accept, reject, or modify the recommended disposition; receive further evidence;

or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

## BACKGROUND

The following is a summary of the facts underlying this cause as well as the arguments of the parties. It incorporates in part the corresponding portion of the magistrate judge's order.

Plaintiff is a corporation organized and existing under the laws of Tennessee and maintains its principal place of business in Milan, Gibson County, Tennessee. (Compl. ¶ 1, D.E. 1.) AUCRA is a corporation organized and existing under the laws of the British Virgin Islands and maintains its principal place of business in Omaha, Nebraska. (Id. ¶ 2.) Tracy Light is a Tennessee resident and an insurance agent who at the pertinent times was employed by Brown and Brown (formerly Security Services, Inc.). (Id. ¶ 3.) Brown and Brown is an insurance intermediary organization or insurance broker that provides a variety of insurance and reinsurance products and services to businesses. (Id. ¶ 4.)

Plaintiff states that on or about September 25, 2008, as its existing workers' compensation insurance coverage was coming to the end of its term, Light met with Plaintiff and provided proposals for insurance. (Id. ¶ 12.) Plaintiff chose the Workers Compensation Profit Sharing Plan, also known as EquityComp® (hereinafter "EquityComp"), offered by Applied Underwriters, Inc. ("AUI").[1]  (See id. at Ex. 1, D.E. 1-3.) Under EquityComp, as proposed, AUI would procure

---

[1]AUCRA argues that Plaintiff, in its complaint, and the magistrate judge, in his order, improperly conflate AUCRA and AUI, failing to appreciate that the two are separate entities. AUCRA represents that, contrary to the magistrate judge's understanding, it [AUCRA] is an "indirect subsidiary" of AUI. (D.E. 46 at 5.) As well, the EquityComp proposal, which AUCRA has presented to the Court, describes AUCRA as a "subsidiary of [AUI]." (See EquityComp Workers' Compensation Program Proposal & Rate Quotation, Ex. 1 to Def.'s Resp. in Opp'n to Pl.'s Mot. to Stop Arbitration, D.E. 15-1 at 3.) The Court agrees that Plaintiff and the magistrate judge alike improperly failed to distinguish AUCRA from AUI. As such, where possible, the Court attempts herein to identify which of these two entities is intended by each of the various

6

guaranteed-cost workers' compensation insurance policies for Plaintiff through California Insurance Company ("CIC") and Continental Indemnity Company ("Continental") (collectively referred to as "the Issuing Insurers"), both affiliated licensed insurers, and AUCRA would for Plaintiff's benefit maintain a segregated "protected cell" from which a portion of Milan's workers' compensation-related benefits would be paid.  (Id. ¶ 19.)  According to Plaintiff, this was boasted as a "profit sharing plan" and characterized in the proposal as a reinsurance transaction.  (Id. ¶ 17.)

Following Milan's choice of EquityComp, it entered into a three-year "Reinsurance Participation Agreement" ("RPA") with AUCRA, effective October 1, 2008.  (Id. ¶ 22; RPA, Ex. 4 to Compl., D.E. 1-4.)  Under the RPA, Plaintiff would capitalize, and AUCRA would maintain, a segregated cell account through which Plaintiff would share in the benefit of good loss experience at the risk of bearing the cost of unfavorable loss experience.  (Report of Examination of CIC, Ex. 6 to Def.'s Resp. in Opp'n to Mot. to Stop Arbitration, D.E. 15-6 at 10–12.)  This was complementary to a standing agreement between AUCRA and the Issuing Insurers, titled Quota Share Reinsurance Agreement (hereinafter "Reinsurance Treaty"), obligating AUCRA to cover a portion (or layer) of loss incurred under EquityComp-participating insureds' workers' compensation policies in exchange for receiving a commensurate portion of the premiums paid to the Issuing Insurers under these policies.  (Reinsurance Treaty, Ex. 7 to Def.'s Resp. in Opp'n to Mot. to Stop Arbitration, D.E. 15-7.)  Although Milan was not a party to the Reinsurance Treaty, the captive cell that AUCRA would establish for Milan was.  (Report of Examination of CIC, 15-6 at 11.)

Pursuant to these two agreements and the terms of Plaintiff's workers' compensation

---

generic references to "Applied Underwriters" or "Defendant" in the complaint and/or in the magistrate judge's order.

policies, EquityComp functioned as follows.[2]  The Issuing Insurers, through their billing agent,

Applied Risk Services, Inc. ("ARS"), collected from Plaintiff the premiums that were due the

Issuing Insurers under the policies.  (EquityComp Workers' Compensation Program Proposal &

Rate Quotation, Ex. 1 to Def.'s Resp. in Opp'n to Pl.'s Mot. to Stop Arbitration, D.E. 15-1 at 5;

Report of Examination of CIC, D.E. 15-6 at 7.)  The Issuing Insurers then ceded a portion of these

premiums to AUCRA to be allocated into Plaintiff's segregated cell account.  (Aff. of Bernd G.

Heinze ¶ 58, Ex. 4 to Def.'s Resp. in Opp'n to Mot. to Stop Arbitration, D.E. 15-4.)  The portion of

premiums that the Issuing Insurers ceded was based on the percentage of risk (losses) that had

likewise been ceded to AUCRA for indemnification.  (Id.)  Also fed into Plaintiff's segregated cell

account was the capital contribution that Plaintiff was required to pay and maintain under the RPA.

(Id. ¶ 59.)  Milan deposited $334,000 of capital into its segregated cell at the inception of the cell,

and additional capital deposits were to be calculated and billed to Plaintiff on a monthly basis

thereafter.   (Compl. ¶ 23, D.E. 1; Report of Examination of CIC, D.E. 15-6 at 11;  EquityComp

Workers' Compensation Program Proposal & Rate Quotation, D.E. 15-1 at 3.)  The final capital cost

(for the three-year term of the RPA) for which Plaintiff would be ultimately responsible was to be

"retrospectively" determined, based upon a number of variables, including Plaintiff's payroll and

---

[2]Defendant contends that the magistrate judge's factual recitation reflects a
"misunderstanding of how the [EquityComp] program worked" and that the magistrate judge
simply "accepted Milan's characterization of the facts . . . verbatim [without] consider[ing] or
explain[ing] the inapplicability of the plain language of the [EquityComp proposal] and RPA as
well as the evidence submitted by AUCRA."  (D.E. 46 at 17, 19.)  Although the Court does not
find that the magistrate judge fundamentally misunderstood EquityComp, some aspects of the
magistrate judge's factual findings, while consistent with allegations in the complaint, do not
account for conflicting evidence presented by AUCRA on the point.  To that extent, and upon *de
novo* review, the Court REJECTS in part the magistrate judge's factual findings as to the basic
details of EquityComp.

its loss experience.  (Aff. of Bernd G. Heinze ¶¶ 60–61, D.E. 15-4; EquityComp Workers' Compensation Program Proposal & Rate Quotation, D.E. 15-1 at 3; RPA, D.E. 1-4 at 10–11.) Together, the ceded portions of Milan's insurance premiums along with its capital contribution constituted Milan's "reserve."  (Report of Examination of CIC, D.E. 15-6 at 12.)  From this reserve, the Issuing Insurers were indemnified–pursuant to the Reinsurance Treaty–for a specific portion of loss sustained under Plaintiff's workers' compensation policies.  (Aff. of Bernd G. Heinze ¶ 48, D.E. 15-4.)  The portion of loss that AUCRA was obligated to cover, and that was paid out of Milan's segregated cell, was a layer of aggregate loss defined at one end by a specified minimum amount and at the other by a maximum amount equal to Milan's reserve.  (Report of Examination of CIC, D.E. 15-6 at 12; Reinsurance Treaty, D.E. 15-7 at 17–18.)  Under this layered approach, the Issuing Insurers remained directly liable for all of Milan's losses up to the minimum amount as well as any exceeding the maximum amount, without reimbursement from Milan's AUCRA-held segregated account.  (Aff. of Bernd G. Heinze ¶ 67, D.E. 15-4.)

The RPA contained an arbitration clause that stated the parties would "resolve any disputes arising under [the agreement] without resort to litigation."  (RPA ¶ 13(A), D.E. 1-4.)  The clause contemplated a two-step process in which the parties would first attempt to amicably settle "by good faith discussion" among the parties all disputes "relating in any way to (1) the execution and delivery, construction or enforceability of [the agreement], (2) the management or operations of [AUCRA], or (3) any other breach or claimed breach of [the agreement] or the transactions contemplated [therein]."  (Id. ¶ 13(B).)  Then, "failing such amicable settlement," the dispute(s) would be determined by binding arbitration "in the British Virgin Islands under the provisions of the American Arbitration Association."  (Id.  ¶ 13(A)-(B).)  Elsewhere in the arbitration clause,

however,  it was provided that arbitration proceedings may take place *either* "in Tortola, British Virgin Islands *or* at some other location agreed to by the parties."  (Id. ¶ 13(I)(emphasis added).) The arbitration requirement would apply fully to "[a]ll disputes arising with respect to any provision of [the agreement]" and would "survive the termination of [the agreement] and be deemed to be an obligation of the parties which is independent of, and without regard to, the validity of [the agreement]."  (Id. ¶ 13(B) & (K).)  The RPA also contained choice-of-law and forum-selection clauses.  The choice-of-law provision provided that the agreement "shall be exclusively governed by and construed in accordance with the laws of Nebraska." (RPA ¶ 16, D.E. 1-4.)  The RPA's forum-selection clause required that "any matter concerning [the agreement] that is not subject to the dispute resolution provisions of [the arbitration clause] be resolved exclusively by the courts of Nebraska without reference to its conflict of laws."  (Id.)

The dispute precipitating this suit arose in early 2011 when Milan significantly reduced its workforce but was nonetheless billed for EquityComp premiums that were, according to Plaintiff, higher than ever before.  (Compl. ¶¶ 103–08, D.E. 1.)  After Plaintiff failed to pay its premium in May 2011, it received notice that its workers' compensation policies and the RPA were being terminated for nonpayment.  (Id. ¶¶ 110-11.)  For approximately the next year, the parties attempted but failed to reach a settlement over the amount owed by the insured in unpaid premiums and early-cancellation penalties.  (Id. ¶¶ 113-21.)  On May 29, 2012, AUCRA filed a formal demand for arbitration with the American Arbitration Association. (Compl. ¶ 118, D.E. 1; Letter, Ex. 18  to Def.'s Resp. in Opp'n to Mot. to Stop Arbitration, D.E. 15-18.)  On that same day, counsel for Plaintiff requested that Defendant hold or delay its demand "until the parties can try to settle this dispute amicably by 'good faith discussion' which is contemplated by the Reinsurance Participation

Agreement." (Email, Ex. 19 to Def.'s Resp. in Opp'n to Mot. to Stop Arbitration, D.E. 15-19.)  On May 31, 2012, AUCRA responded by letter, setting out its attempts to resolve the dispute and offering that Defendant "would look favorably upon a request to extend the date for Milan Express' response to the Demand if there is a bona fide intent to resolve this matter." (Letter,  Ex. 17 to Def.'s Resp. in Opp'n to Mot. to Stop Arbitration, D.E. 15-17.)   Plaintiff admitted its bona fide intent and agreed to participate in pre-arbitration mediation and, in exchange, Defendant agreed to stay the arbitration proceedings for forty-five days.  (Email, Ex. 20 to Def.'s Resp. in Opp'n to Mot. to Stop Arbitration, D.E. 15-20.)   On July 26, 2012, Milan requested an additional stay of arbitration to allow more time to finalize and conduct the mediation. (Email, Ex. 21 to Def.'s Resp. in Opp'n to Mot. to Stop Arbitration, D.E. 15-21.)  On February 13, 2013, the parties attended mediation in Chicago, Illinois, but failed to resolve the dispute.  (*See* 15-22 at 4.)

To date, Plaintiff states it has paid $8,065,099 under the RPA.  (Compl. ¶ 122, D.E. 1.)  AUI claims somewhere between $3,366,904.20 and $4,909,200.61 is outstanding and due it under the RPA and has made demand for payment, but Plaintiff has refused. (Id. ¶ 123).  The insured complains that the RPA is intentionally vague and confusing, and that despite representations by AUI and its agents to the contrary, no investment income applied to the cell. Based on these facts, Milan filed a complaint in this Court on February 25, 2013, seeking declaratory relief and reformation of the RPA, along with claims of fraudulent misrepresentation, negligent misrepresentation, and breach of contract; and seeking punitive damages.

Relying on the arbitration clause in the RPA, Defendant filed its motion to compel arbitration on April 26, 2013, requesting that this action be dismissed and referred to arbitration.  (D.E. 16.)  Alternatively, the Defendants moved under 28 U.S.C. § 1404(a) to transfer venue of the action to

the United States District Court for the District of Nebraska, the forum the parties contractually selected in the RPA.  (D.E. 17.)  Milan, on the other hand, has moved to stop any pending arbitration in this matter, arguing that the arbitration clause is unenforceable under Nebraska law.  (D.E. 5.)

*ANALYSIS*

A.  Defendant's Motion to Compel Arbitration

In deciding whether to compel arbitration of the parties' dispute, Magistrate Judge Bryant analyzed the enforceability of the RPA's arbitration clause under Nebraska law, which the parties agreed controls.  Defendant objects to this portion of the order, contending that the magistrate judge applied an incorrect legal standard.  (D.E. 46 at 11.)  Defendant cites to HRL Land or Sea Yachts v. Travel Supreme, Inc., No. 1:07-cv-945, 2009 WL 125845 (W.D. Mich. Jan. 16, 2009), for the proposition that a motion to compel arbitration must be evaluated "as though it were a motion for summary judgment," such that the party opposing arbitration "must show a genuine issue of material fact as to the validity of the agreement to arbitrate."  Id. at *3 (citing Great Earth Cos. v. Simons, 288 F.3d 878, 889 (6th Cir. 2002)).  This position is consistent with the decision in Great Earth Companies, Inc. v. Simons, wherein the Sixth Circuit framed the issue presented by a motion to compel arbitration as "whether the parties have agreed to arbitrate the dispute at issue" and stated that a party seeking to show that the validity of the agreement is "in issue" bears a burden "mirror[ing] that required to withstand summary judgment in a civil suit."  288 F.3d at 889.  Here, the magistrate judge, in his order, did not identify the standard under which he analyzed Defendant's motion and did not indicate which party bore the burden of proof on the question of validity.  However, even viewing the facts in a light most favorable to Defendant and placing the burden of proof on Plaintiff, the Court, reviewing the matter *de novo*, ultimately agrees with the magistrate

judge's determination that the RPA's arbitration clause is invalid and unenforceable under governing Nebraska law.  As such, the Court is not compelled on this basis to reject the magistrate judge's recommendation.

Contrary to the contention of the Defendant, (*see* D.E. 46 at 12), the magistrate judge did not err in failing to conclude that the "gateway" question of arbitrability–here, whether the parties entered into a valid agreement to arbitrate–was itself a matter to be submitted to arbitration, pursuant to the RPA.   "[A]bsent clear and unmistakable evidence that contracting parties intended an arbitrator (rather than a court) to resolve questions of arbitrability, courts should *independently* decide whether an arbitration panel has jurisdiction over merits of any particular dispute."  Solvay Pharms, Inc. v. Duramed Pharms., Inc., 442 F.3d 471, 477 (6th Cir. 2006)(emphasis in original)(internal quotation marks omitted)(citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 941, 945, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)); *accord* United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 583 n.7, 80 S. Ct. 1347, 1353 n.7, 4 L. Ed. 2d 1409 (1960)("Where the assertion by the claimant is that the parties excluded from court determination not merely the decision of the merits of the grievance but also the question of arbitrability, vesting power to make both decisions in the arbitrator, the claimant must bear the burden of a *clear demonstration* of that purpose." (emphasis added)).  There is no indication in the RPA that the parties explicitly agreed to submit to the arbitrator the very issue of arbitrability. *Cf.* Graphic Arts Int'l Union, Local 199B v. Dayton Press, Inc., 573 F. Supp. 4, 7 (S.D. Ohio 1983)(concluding that the question of arbitrability was not for the arbitrator to decide because the subject agreement did not contain an "unequivocal" expression of the parties' intent to submit such question to the arbitrator).  As such, the issue is within the province of the Court to resolve, and this objection is

overruled.

On the question of arbitrability, the magistrate judge found the RPA's arbitration clause unenforceable under § 25-2602.01(f)(4) of the Nebraska Revised Statutes.  Section 25-2602.01 provides, in pertinent part, that "[a] provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid [and] enforceable," Neb. Rev. Stat. § 25-2602.01(b), except when that written contract is "an agreement concerning or relating to an insurance policy other than a contract between insurance companies including a reinsurance contract," Neb. Rev. Stat. § 25-2602.01(f)(4).

AUCRA objects to the fact that the magistrate judge focused solely on whether the RPA fell into the narrow exception for reinsurance contracts without first analyzing whether the statute was even applicable to the RPA.  According to Defendant, it need not rely on § 25-2602.01's exception for reinsurance contracts because the RPA does not "concern or relate to a policy of insurance" and therefore is outside the scope of subsection (f)(4).  It contends that the statute is aimed only at prohibiting arbitration provisions in *traditional* insurance contracts between an insurance company and its insured.  In support, Defendant relies on Kremar v. Rural Community Insurance Co., 788 N.W.2d 538 (Neb. 2010), wherein the Nebraska Supreme Court observed that § 25-2602.01(f)(4) "regulates the insurer-insured contractual relationship."  Id. at 553.  However, this language in Kremar was part of a discussion concerning possible reverse preemption, and the court was focused on the narrow question of whether the statute "was enacted for regulating the business of insurance" under the McCarran-Ferguson Act, *see* id. at 551.  In finding that § 25-2602.01(f)(4) does in fact regulate the business of insurance in that it "regulates the insurer-insured contractual relationship" the Kremar court did not state that such was the *extent* of the statute's function.  Thus, Defendant's

reliance on <u>Kremar</u> is unavailing.

Furthermore, to interpret the statute as Defendant suggests would be to render the exception for reinsurance contracts meaningless.  If the general prohibition was intended to apply only to traditional insurance contracts between an insurance company and its insured, there would have been no need for the drafters to include an exemption for contracts of reinsurance since the general rule would not have applied to those contracts in the first place.  As Defendant itself posits, "reinsurance contracts are not insurance contracts," (D.E. 46 at 15 (quotation omitted)).  And, in Nebraska and elsewhere, it is a well-settled rule of statutory construction that a statute should not be given an interpretation that would render any of its sections superfluous, redundant, or meaningless.  <u>Sch. Dist. of Omaha v. Gass</u>, 267 N.W. 528, 531 (Neb. 1936).  Accordingly, this Court will avoid such an interpretation so long as the language of § 25-2602.01(f)(4) is capable of some other reasonable construction.

Section 25-2602.01(f)(4), by its very terms, applies not just to traditional insurance policies, but to any agreement "concerning or relating to an insurance policy."  When interpreting a statute, a court should give statutory language its "plain and ordinary meaning." <u>White v. Kohout</u>, 839 N.W.2d 252, 260 (Neb. 2013).  Because the terms "concerning" and "relating to" are not defined in the statute, this Court looks to other sources to aid in its interpretation. *See* <u>Mid-S. Order Buyers, Inc. v. Platte Valley Livestock, Inc.</u>, 315 N.W.2d 229, 232 (Neb. 1982)("[W]e think it advisable to begin our analysis with the statutory language itself and the aid of the dictionary.").  Merriam–Webster's Online Dictionary defines the verb "concern" as "to relate to (something or someone): to be about (something or someone)."  *Concern* (v), Merriam–Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/concern.  The same dictionary defines

"relate," as it is used in the statute, as "to have relationship or connection." *Relate*, Merriam–Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/relate. Using this definition, the Court finds that the RPA "relates to" an insurance policy within the meaning of § 25-2602.01(f)(4). The RPA belongs to a network of agreements–the others being the Reinsurance Treaty and the workers' compensation policies issued to Plaintiff–that together make up EquityComp. Through this network, the RPA not only complemented the workers' compensation policies that Plaintiff obtained from the Issuing Insurers, but in fact relied upon the existence of these policies to function. *Cf.* Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138–40, 111 S. Ct. 478, 482–83, 112 L. Ed. 2d 474 (1990)(applying the dictionary definition of "relate to," as used in ERISA's preemption provision, to find that a law "related to an ERISA plan" where it relied on the existence of such a plan to operate). In this way, the RPA, at the very least, has a "connection" with, and therefore "relates to," these insurance policies. Thus, it falls within the scope of § 25-2602.01(f)(4)'s general prohibition on arbitration clauses.

AUCRA also objects to the magistrate judge's finding that the RPA is not a reinsurance contract under the exception to § 25-2602.01(f)(4). According to Defendant, the magistrate judge's "misunderstanding of how [EquityComp] works is the foundation for [his] erroneous conclusion that the RPA is not a reinsurance transaction." (D.E. 46 at 19.) It also contends that the magistrate judge erred in failing to consider certain evidence that it submitted on this issue and/or in failing to hold an evidentiary hearing before resolving factual conflicts in the parties' submissions. Even if the Court were to find each of these objections sound and further that the RPA is a reinsurance contract, it would still be inclined to agree with the magistrate judge as to his ultimate conclusion that the RPA does not fit within the statute's exception. This is, because, setting aside the issue of whether

16

the RPA can be characterized as a reinsurance contract, there is an independent basis for finding the exception inapplicable.   The RPA is a contract between Milan and AUCRA.   Section § 25-2602.01(f)(4)'s exception is only for "a contract between insurance companies," including but not limited to a reinsurance contract.   *See* § 25-2602.01(f)(4).   Because Milan is not an insurance company, the RPA, even if it can properly be characterized a reinsurance contract, does not fall under the exception.

Before concluding his analysis, the magistrate judge addressed the Defendant's position that the doctrines of waiver and estoppel prevented Milan from contesting the validity of the arbitration clause.   Defendant argued that by attempting to resolve the parties' dispute informally and requesting mediation, Plaintiff had already performed under the first step of the RPA's arbitration clause.   However, the magistrate judge concluded there had been no waiver because "[a]t no point did Defendant makes its participation in the mediation or informal settlement negotiations contingent upon Plaintiff agreeing to waive arguments or defenses."   (Order, D.E. 42 at 11.) Defendant objects to this conclusion, insisting once again that the magistrate judge employed an incorrect legal standard in reaching it.   According to Defendant, the magistrate judge improperly placed the burden on AUCRA to "make its participation in the mediation or informal settlement negotiations contingent upon [Milan] agreeing to waive arguments or defenses," (D.E. 46 at 26 (alteration in original)(internal quotation marks omitted)(quoting Order, D.E. 42 at 11)).

The magistrate judge did not cite to any legal standard in conducting his analysis of waiver and estoppel, but the parties apparently agree that Nebraska law should apply.   In Nebraska,

> [w]aiver has been defined as a voluntary and intentional relinquishment or abandonment of a known existing legal right, advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed; the voluntary abandonment or surrender, by a capable person, of a right known by him to exist,

17

> with the intent that such right shall be surrendered and such person forever deprived of its benefits; or such conduct as warrants an inference of the relinquishment of such right; or the intentional doing of an act inconsistent with claiming it.

Five Points Bank v. Scoular-Bishop Grain Co., 350 N.W.2d 549, 552 (Neb. 1984)(citation omitted). Ordinarily, waiver must be established by proof of a clear, unequivocal, and decisive act of a party showing such a purpose, or acts amounting to an estoppel on his part. Id. (citation omitted).  While it agrees that this did not require Defendant to procure an express waiver from Plaintiff, the Court is not able to conclude that Milan's conduct amounted to an implied waiver of its right to challenge the enforceability of the arbitration clause under § 25-2602.01(f)(4).   Plaintiff's action in acquiescing to and even invoking the first step of the RPA's proscribed arbitration procedure did not "warrant an inference of the relinquishment of [its] right" to challenge the arbitration clause because it is evident from the parties' communications that Plaintiff's goal in continuing to participate in good-faith settlement attempts was merely to postpone the arbitration that Defendant had been threatening.  (See Email, D.E. 15-19 at 1 (requesting that AUCRA hold or forestall its arbitration demand "until the parties can try to settle this dispute amicably by 'good faith discussion'").)  Even when viewed in the light most favorable to Defendant, this act by Plaintiff was neither "clear, unequivocal, [nor] decisive" of an intent to relinquish its right to later attack the arbitration clause's validity.  As such, the evidence is insufficient for a finding of implied waiver. Cf. Woodcrest Nursing Home v. Local 144, Hotel, Hosp., Nursing Home & Allied Servs. Union, 788 F.2d 894, 899 (2d Cir. 1986)(per curiam)(finding no waiver of right to challenge arbitration where "participation [in preliminary proceedings before arbitrator] was minimal, amounting for the most part to efforts to postpone and delay arbitration").

Likewise, the doctrine of equitable estoppel does not bar Plaintiff's challenge.  Although,

as Defendant points out, the magistrate judge did not set forth the relevant legal standard before concluding Plaintiff's conduct did not warrant the imposition of equitable estoppel, his conclusion is nonetheless well supported by Nebraska law.  Equitable estoppel is appropriate where there is, as to the party estopped,

> (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts; as to the other party, (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.

Chappelear v. Grange & Farmers Ins. Co., 210 N.W.2d 921, 924 (Neb. 1973).  Even if Plaintiff's conduct could be said to amount to a "false representation" that it would not challenge the arbitration clause, Defendant has not shown that it relied on such representation to its "injury, detriment, or prejudice," as required under the sixth element.  AUCRA is in no worse a position, having participated in good-faith settlement attempts and mediation, than it would have been otherwise. As such, equitable estoppel does not apply.

Finally, in its independent assessment of this matter, the Court has determined that even if Defendant's motion to compel were otherwise well taken, it would be subject to denial because this Court does not have the authority to grant the precise relief sought.  Although Defendant's motion did not so state, the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, provides the mechanism for enforcing the RPA's purported arbitration requirement since the RPA is "a contract evidencing a transaction involving commerce."  9 U.S.C. § 2.  Section Four of the Act provides, "A party . . . may petition any United States district court which, save for [an arbitration agreement between the

parties] would have jurisdiction under Title 28 . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." Id. § 4.  However, where a court "direct[s] the parties to proceed to arbitration," the proceedings "shall be within the district in which the petition for an order directing such arbitration is filed." Id.  As interpreted by the Sixth Circuit, this instructs that when a party seeks to compel arbitration in a forum contemplated by an arbitration agreement, "only a district court in that forum has jurisdiction to compel [such] arbitration pursuant to Section 4 [of the FAA]." Mgmt. Recruiters Int'l, Inc. v. Bloor, 129 F.3d 851, 854 (6th Cir. 1997). In other words, no federal court may, under the FAA, compel arbitration outside of its own district. Inland Bulk Transfer Co. v. Cummins Engine Co., 332 F.3d 1007, 1018 (6th Cir. 2003).

This geographic-nexus requirement is fatal to Defendant's motion.  Although the motion itself does not specify where the arbitration Defendant seeks to compel would occur, Defendant makes clear in later briefing that it "would take place in Chicago, the same place where the parties conducted their pre-arbitration mediation."  (D.E. 51-1 at 2.)  This Court, sitting in the Western District of Tennessee, is without jurisdiction, pursuant to § 4 of the FAA, to order the parties to arbitrate in Chicago, Illinois.  For this reason, as well as those set forth above, the motion to compel arbitration is DENIED.

B.  Plaintiff's Motion to Stop Arbitration

The vast majority of Defendant's objections, treated above, to the denial of its motion to compel arbitration are likewise objections to the grant of Plaintiff's motion to stop arbitration, as these motions share the common question of arbitrability.  The Court need not revisit these objections, and Defendant has not lodged any additional objections specific to the magistrate judge's handling of the motion to stop arbitration.

As an aside, the Court acknowledges the existence of some authority holding that a court is without jurisdiction to stay arbitration proceedings outside its district. These decisions have reached such result by applying the geographic-nexus requirement of § 4 of the FAA to motions to compel arbitration and to motions to stay arbitration alike. *See, e.g.*, S. Concrete Prods., Inc. v. Arco Design/Build, Inc., No. 1:11cv194, 2012 WL 1067906, at *8 (W.D.N.C. Mar. 29, 2012); UAL Corp. v. Mesa Airlines, Inc., 88 F. Supp. 2d 910, 913–14 (N.D. Ill. 2000); Horizon Plastics, Inc. v. Constance, No. CIV. A. 99-6132, 2000 WL 1176543, at *4 (D.N.J. Aug. 11, 2000). However, § 4 does not explicitly vest courts with the authority to stay or enjoin arbitration, as it does with the power to compel arbitration. In fact, it does not mention this relief at all, and there is no other provision in the Act authorizing a stay of arbitration. While some courts have inferred a power to stay arbitration from the power granted by the FAA to compel arbitration, *see* Tai Ping Ins. Co. v. M/V Warschau, 731 F.2d 1141, 1144 (5th Cir. 1984); Societe Generale de Surveillance, S.A. v. Raytheon Eur. Mgmt & Sys. Co., 643 F.2d 863, 868 (1st Cir. 1981)(noting that "to enjoin a party from arbitration where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present"), others have recognized this authority as incumbent in the courts' traditional equitable powers, *see* Textile Unlimited, Inc. v. A..BMH & Co., 240 F.3d 781, 785 (9th Cir. 2001); DECO, Inc. v. United Gov't Sec. Officers of Am., No. 2:04cv735, 2005 WL 2298166, at *4 (E.D. Va. Sept. 21, 2005)("The Court presumably has authority to issue an injunction staying arbitration . . . under its traditional equitable powers.").

Although the Sixth Circuit has not directly spoken on the issue, it has on at least one occasion applied one of the general venue provisions in 28 U.S.C. § 1319 in an action to enjoin arbitration pending in another district, *see* First of Mich. Corp. v. Bramlet, 141 F.3d 260, 264 (6th

21

Cir. 1998), implicitly suggesting that, whatever the origin of the power to enjoin arbitration proceedings, the power is not subject to FAA § 4's venue restraint.  This is the position of the Ninth Circuit Court of Appeals, which concluded in <u>Textile Unlimited, Inc. v. A. BMH & Co.</u> that, by its very terms, § 4 only covers actions to compel arbitration, and, as such, the general venue statute controls actions to stay or enjoin arbitration.  240 F.3d at 785.  The court further reasoned that "[r]equiring a party to contest the very existence of an arbitration agreement in a forum dictated by [a] disputed arbitration clause would run counter to [the] fundamental principle" that a party cannot be required to arbitrate a dispute not covered by a valid arbitration agreement.  <u>Id.</u> at 786.  This Court finds the <u>Textile Unlimited</u> reasoning persuasive.

Furthermore, as the Sixth Circuit recently reiterated, "the Judiciary Act of 1789 vested district courts with jurisdiction over 'all suits of a civil nature at common law or in equity,' and Rule 65 of the Federal Rules of Civil Procedure provided a mechanism through which district courts could exercise the equitable power to issue injunctions," and these "general provisions" govern requests for injunctive relief unless a more specific provision applies to the matter.  <u>Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund</u>, 726 F.3d 738, 753–54 (6th Cir. 2013), *reh'g & reh'g en banc denied* (Sept. 19, 2013).  Because § 4 of the FAA is a specific provision governing motions to compel arbitration, it makes sense that the venue limitation contained within § 4 takes precedence over Title 28's general venue provisions in actions to compel arbitration.  *See* <u>United States v. Perry</u>, 360 F.3d 519, 535 (6th Cir. 2004)("One of the most basic canons of statutory interpretation is that a more specific provision takes precedence over a more general one.").  By contrast, however, a motion to stay arbitration does not fall under any particular statutory provision and is instead covered by general provisions, including the Judiciary Act and Rule 65, as well as the

general venue rules in 28 U.S.C. § 1391.  Under § 1391(b)(2), venue is proper here in the Western District of Tennessee because Madison County, Tennessee, which is in this district, is where most of the underlying transactions took place.

Having found the parties' arbitration agreement unenforceable under governing law, the Court GRANTS the Plaintiff's motion to stop arbitration of this dispute, whether in Chicago, Illinois, or in any other location.

C. Defendant's Motion to Transfer Venue

After concluding that this action should remain in federal court, Magistrate Judge Bryant considered Defendant's motion to transfer the case to the United States District Court for the District of Nebraska.  The basis of Defendant's motion was ¶ 16 of the RPA, which stated that "any matter concerning this Agreement that is not subject to the dispute resolution provisions [of the arbitration clause] be resolved exclusively by the courts of Nebraska," (RPA ¶ 16, D.E. 1-4).  Under 28 U.S.C. § 1404(a), a district court may, "[f]or the convenience of parties and witnesses, in the interest of justice, . . . transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

In denying § 1404(a) transfer, the magistrate judge considered the following factors: "(1)[whether] the action could have initially been filed in the transferee forum; (2) [whether] the transfer provides greater convenience to the witnesses and parties; and (3) [whether] the transfer better serves the interests of justice."  (Order, D.E. 42 at 13–14 (citing Carborundum Co. v. Bay Fabricators, Inc., 461 F. Supp. 437 (E.D. Tenn. 1978).)  AUCRA objects that the magistrate judge failed to properly weigh these factors.  Specifically, Defendant attacks the magistrate judge's failure to give "adequate weight" to the presence of the forum-selection clause in the RPA requiring the

parties to bring their claims in the courts of Nebraska.  (D.E. 46 at 29.)  While the existence of a forum-selection clause in the governing contract is a factor to consider when assessing whether the "interests of justice" will be served by a § 1404(a) transfer, "[s]uch a clause should [not] receive [] dispositive consideration."  Kerobo v. Sw. Clean Fuels, Corp., 285 F.3d 531, 537–38 (6th Cir. 2002)(citations and internal quotation marks omitted).  Thus, even if a clause is fully enforceable, the contractually chosen forum may be eschewed in favor of a forum mandated by the weight of the § 1404(a) factors.  This appears to be the result reached by the magistrate judge here who found that the weight of the factors, including witness convenience–which the parties agreed was the "most important factor"–pointed toward venue in the Western District of Tennessee.  (See Order, D.E. 42 at 16 (quoting Azarm v. $1.00 Stores Servs., Inc., No. 3:08-1220, 2009 WL 1588668, at *4 (M.D. Tenn. June 5, 2009))("[T]he presence of a valid forum selection clause does not necessarily mean that transfer of the action is inappropriate, because other Section 1404[] factors may act as a sufficient counterweight to the forum selection clause such that they dictate the result.".)

"Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'"  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S. Ct. 2239, 2244, 101 L. Ed. 2d 22 (1988)(quoting Van Dusen v. Barrack, 376 U.S. 612, 622, 84 S. Ct. 805, 812, 11 L. Ed. 2d 945 (1964))(quotation marks omitted).   In exercising that discretion, this Court agrees with the magistrate judge that the weight of the factors favors retaining the case in the Western District of Tennessee.  Several important facts were key to the magistrate judge's determination:

> [T]his case arises out of an insurance policy obtained by a Tennessee company in Tennessee through a Tennessee agent that resulted in premiums paid for in Tennessee.  The alleged fraudulent and negligent misrepresentations were made in Tennessee.  The contract that was allegedly breached was formed in Tennessee.  The

24

> majority of the witnesses are located in Tennessee. . . . Nebraska . . . has very little relation to this case.

(Order, D.E. 42 at 17.)  Given these facts, with heaviest weight placed upon the convenience of the witnesses, transferring this case to Nebraska, despite it being the contractually specified forum and the state whose law will govern, would not serve the interest of justice.  *See* Returns Distrib. Specialists, LLC v. Playtex Prods., Inc., No. 02-1195-T, 2003 WL 21244142, at *7 (W.D. Tenn. May 28, 2003)(collecting cases and concluding that "[t]he most significant factor when considering a transfer under § 1404 is the convenience of the witnesses").

In so finding, the Court rejects the Defendant's argument, (D.E. 46 at 30), that the public-interest concern of  "maintaining systemic integrity" tips the balance in favor of a transfer.  Assuming *arguendo* that "adhering to settled principles of freedom of contract and the enforceability of forum selection clauses" is even a matter of systemic integrity, as Defendant would suggest, this concern must yield to the countervailing concerns of convenience and fairness.  *See* Ricoh, 487 U.S. at 30–31, 108 S. Ct. at 2244 (anticipating that "because of [other significant] factors[,] a district court acting under § 1404(a) [may] refuse to transfer a case notwithstanding the counterweight of a forum-selection clause").  The motion to transfer venue is DENIED.

## IV.  CONCLUSION

For the reasons articulated herein and upon *de novo* review, the Court hereby ADOPTS the ultimate decisions of the magistrate judge that Defendant's motion to compel arbitration be DENIED; Plaintiff's motion to stop arbitration be GRANTED; and Defendant's motion to transfer venue to the District of Nebraska be DENIED.

IT IS SO ORDERED this 23rd day of January, 2014.

s/ J. Daniel Breen

25

J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE